UNITED STATES of America

v.

**Nolan COLEY.**

**Criminal No. L–06–0170.**

United States District Court,
D. Maryland.

Dec. 13, 2006.

George Levi Russell, III, Rod J. Rosenstein, Office of the United States Attorney,

---

Baltimore, MD, for United States of America.

Thomas L. Crowe, Law Office of Thomas L. Crowe, Baltimore, MD, for Nolan Coley.

## MEMORANDUM

LEGG, Chief Judge.

Pending before the Court is defendant Nolan Coley's ("Coley") Motion to Suppress Evidence. The Court held an evidentiary hearing and, for the reasons set forth below, will DENY Coley's motion by separate Order.

## I. Background

On April 13, 2006, a federal grand jury returned a one-count indictment charging Coley with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Now before the Court is Coley's motion requesting suppression of the firearm. The evidentiary hearing revealed the following facts.

On the evening of December 6, 2005, Detectives Ron Copeland, John Fernandez, and Kurt Hameier of the Intelligence Section of the Baltimore City Police Department were working a crime suppression detail in the Brooklyn neighborhood of Baltimore City. The detectives were assigned to the detail as a result of a recent spate of armed robberies in the area.[1] The detectives were patrolling in an unmarked vehicle. Detective Fernandez was driving, Detective Copeland was sitting in the passenger's seat, and Detective Hameier was in the back seat. It was a cold evening, and there was snow on the ground. Each detective was wearing a full uniform that identified him as a police officer with the Baltimore City Police Department.[2]

At approximately 11:00 p.m., the detectives observed the defendant, Nolan Coley, walking down a back alley at a brisk pace. Coley, who was alone, left the alley and stepped onto the sidewalk of the 700 block of Pontiac Street, at which point Detective Fernandez pulled the unmarked vehicle along side Coley. Coley was walking on the passenger side of the squad car. Detective Fernandez lowered the window, leaned across the car, and asked Coley if he had a gun.[3] Coley, who was close

---

1. At the hearing, Coley's attorney introduced a Baltimore City Police Department Calls for Service Report that contained statistics regarding calls for service in the Brooklyn neighborhood in 2005. Coley's attorney argued that the report did not support the contention that there had been an increase in armed robberies. None of the detectives, however, was familiar with the Report or the underlying data. The detectives testified without contradiction they had been informed of an increase in armed robberies in what was already a troubled part of the city. When the detectives were patrolling the Brooklyn neighborhood on December 6th, they believed that they were in a high-crime area.

2. The detectives' uniforms consisted of duty pants, a turtleneck with Baltimore City Police Department identification, and a shiny navy blue jacket with a badge on the front and a police patch on each shoulder.

3. In his written incident report prepared later that evening, Detective Fernandez did not mention that he had asked Coley whether he had a gun. Rather, Detective Fernandez stated merely that immediately upon observing the uniformed detectives, Coley began to run. In the Statement of Probable Cause written a short time later, Detective Fernandez added the fact that he had asked Coley whether he had any weapons. At the hearing on the instant motion, Detective Fernandez explained the discrepancy, stating that when he wrote the incident report, he was at the police station and there was a lot of activity around him. When he later wrote the Statement of Probable Cause, he was in a quieter location and was able to give more thought to what had taken place.

enough to the car to have noticed the detectives' uniforms, looked into the car and responded, "no." [4] Coley, who had a panicked look on his face, began acting fidgety, raised his hands up in the air, darted his eyes from side to side, and began running quickly toward the 800 block of Pontiac Street.

The detectives followed Coley as he ran down Pontiac Street. At one point, Coley crossed in front of the car so that he was running on the driver's side. The 800 block of Pontiac Street is one-way, and the detectives drove the wrong way in pursuit of Coley. The detectives did not, however, activate their lights or sirens. The detectives passed Coley at 804 Pontiac Street. That portion of the road is lit by a street lamp. The car was about 10 yards away from Coley at that point, and Detective Copeland, who was looking over his shoulder through the rear driver's side window, saw Coley stop, reach into his "dip," [5] pull out a black object, and drop the object over a fence. Coley then resumed running, but his gait was slower than before he had dropped the object.

When the car reached the end of the block at 810 Pontiac Street, Detective Fernandez pulled the car over at an angle, blocking Coley. The entire chase lasted approximately forty seconds. Detectives Fernandez and Hameier patted down Coley and placed him in handcuffs. Detective Copeland tied Coley's shoelaces together so that he could not run. By this point, Detective Copeland had not yet told the other detectives that he had seen Coley toss a dark object.

Detective Fernandez, following protocol, retraced Coley's steps to see if he had dropped anything. [6] He saw a black semi-automatic pistol lying on top of the snow inside the front yard at 804 Pontiac Street, the same location where Detective Copeland had seen Coley discard the black object. Detective Fernandez observed that the gun appeared to have been recently placed on top of the snow. Detective Fernandez picked up the gun using the sleeve of his jacket and called to Detective Copeland that there was a gun in the yard. Detective Copeland remarked that he had seen Coley drop something in that area, and he put on a pair of rubber gloves, walked to Fernandez, and took the gun. Through his rubber gloves, Detective Copeland could feel that the gun was dry and warm to the touch. Detective Copeland secured the gun, and the detectives placed Coley under arrest.

## II. Analysis

Coley asks the Court to suppress the firearm, arguing that the detectives seized him illegally and that the gun, therefore, was the fruit of an illegal seizure. [7] Coley's motion raises the question whether, when

---

4. The detectives' testimony differed on this point. Detective Fernandez, who posed the question to Coley, testified that Coley responded, "no." Detective Copeland, on the other hand, testified that Coley did not say anything in response to the question. Detective Hameier, who was sitting in the back seat, did not know if Coley had responded. For purposes of this motion, the Court will credit the testimony of Detective Fernandez, who asked Coley the question and, therefore, was paying the closest attention to Coley's response.

5. In police argot, the area just inside the front waistline of a man's pants is commonly referred to as the "dip."

6. While Detective Fernandez was retracing Coley's steps, Coley told Detectives Copeland and Hameier that he had dropped a "blunt," which is a marijuana cigar.

7. Coley denies that the firearm is the object that he discarded while fleeing from the detectives. For purposes of this motion, the Court assumes, *arguendo*, that Coley discarded the firearm and, therefore, that he has standing to challenge its seizure.

Coley dropped the firearm, he was "seized" within the meaning of the Fourth Amendment. For the reasons stated below, the Court finds that Coley was not seized when he dropped the gun.

■ A seizure under the Fourth Amendment "does not occur simply because a police officer approaches an individual and asks a few questions." *United States v. Brown*, 401 F.3d 588, 593 (4th Cir.2005) (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). Rather, in the absence of physical force, a seizure occurs only if (i) the officer makes a show of authority such that a reasonable person would not feel free to leave, and (ii) the defendant submits to the officer's show of authority. *California v. Hodari D.*, 499 U.S. 621, 626–29, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993).

Assuming that the detectives' pursuit of Coley was a show of authority, Coley ran and, therefore, did not submit to it. The Supreme Court's opinion in *Hodari D.* is instructive on this point. In that case, police officers approached several youths, who fled. The officers gave chase. One of the officers was about to grab defendant Hodari when Hodari tossed away crack cocaine he had been carrying. A moment later, the officer tackled him. *Hodari D.*, 499 U.S. at 622–23, 111 S.Ct. 1547. The Supreme Court assumed that the officer's pursuit of Hodari "constituted a 'show of authority' enjoining Hodari to halt," but concluded that because Hodari "did not comply with that injunction he was not seized until he was tackled." *Id.* at 629, 111 S.Ct. 1547. The drugs that Hodari had abandoned while running were, therefore, not the fruit of an illegal seizure, the Supreme Court held. *Id.*

Coley relies on *United States v. Wilson*, a case that the Fourth Circuit decided after *Hodari D. See Wilson*, 953 F.2d 116 (4th Cir.1991). Coley's reliance is misplaced, however. In *Wilson*, the police officer, who had grounds neither for an arrest nor for a *Terry* stop, requested permission to search the pockets of two coats that Wilson was carrying in an airport. Even though Wilson repeatedly declined, the officer followed the defendant, refusing to take no for an answer, and refusing to allow Wilson to go on his way until he consented to the search. *Id.* at 118–20. The Fourth Circuit reasoned that the officer's prolonged, persistent questioning after the defendant had vigorously and unequivocally expressed his unwillingness to talk further, constituted a seizure under the Fourth Amendment. *Id.* at 122–23.

*Wilson* bears no resemblance to the instant case. The facts at hand are analogous to *Hodari D.* and to a subsequent Fourth Circuit decision, *United States v. Lender*, 985 F.2d 151 (4th Cir.1993). The court, relying on *Hodari D.*, held that a defendant who had dropped a gun while fleeing from police had not yielded to their show of authority. The police approached a group of men on a street corner. The group dispersed, and Lender walked away from the officers. One of the officers called out for the defendant to stop, but Lender refused. As the defendant continued to walk, the officers saw him reach for something in the "dip" area of his pants. The officer again told him to stop, at which point the defendant stopped walking and a gun fell from his waist to the ground. *Id.* at 153.

The Fourth Circuit affirmed the district court's ruling that the defendant had not yielded to the officers' show of authority, and, therefore, had not been seized when he dropped the weapon. The Fourth Circuit stated that the defendant's momentary stop on the sidewalk was not a submission to authority. As the appeals court noted,

Lender was trying to reach for a weapon, an action that is "fully consistent with preparation to whirl and shoot the officers." Moreover, instead of standing still after dropping the gun, the defendant tried to pick up the weapon, an action that did not signify that he was yielding to the officers. *Id.* at 154–55.

In the instant case, Coley never submitted to the detectives' show of authority. Instead, he was fleeing when he discarded the gun. The gun, therefore, was abandoned, and the Fourth Amendment does not apply.

### III.  Conclusion

For the foregoing reasons, the Court concludes that the gun was not the fruit of an illegal seizure and will, by separate Order, DENY Coley's motion to suppress.